Passaic County Court of Common Pleas.

SADIE KATTACK, PETITIONER-APPELLANT, v. WRIGHT AERONAUTICAL CORPORATION, RESPONDENT-APPEL-LEE.

Decided March 15, 1944.

For the petitioner-appellant, *Isadore Rabinowitz*.

For the respondent-appellee, *John W. Taylor*.

DELANEY, C. P. J. Sadie Kattack, widow of Najeib Kattack, a deceased employee of respondent-appellee, filed a petition in the Workmen's Compensation Bureau for compensation on behalf of herself and seven children under sixteen years of age born of her marriage with the decedent. After both parties had submitted their briefs, her petition was dismissed, and she has appealed.

The surface facts—the contentious briefs of opposing counsel notwithstanding—are not in controversy. The difficulty, whatever it may be, lies in fixing the true significance of the facts and in safely determining the relationship, if any, between them. In the particular circumstances of this case, the problem should be primarily for learned, experienced, and neutral members of the medical profession; but we are here confronted, not merely with the usual and disconcerting sharp contradiction between two groups of physicians—one group testifying for one of the parties and the other for the

other party—but by the disquieting phenomenon of experts on the same side (and this is true in this instance of both sides) reaching an ulitmate common opinion by diverse roads, as if nothing in medical science had been definitely settled. The trier of the facts must assess the worth of the medical testimony and determine the matter as best he can.

The decedent worked for the respondent for only eight and one-half hours, that is, from 5:30 o'clock in the afternoon of July 23d, 1940, until 1:30 o'clock the following morning. He was hired as a helper in respondent's basement foundry, where scrap aluminum was remelted and turned into ingots. Save for two days' employment on the W. P. A. (on what dates it does not appear), he had had no work for the preceding five or six months, and meanwhile, for a few days in the month of May, he had been ill from an apparently slight attack of lobar pneumonia. He had a hypertension, "168 over 100," now agreed by all to have been due to hardening of the arteries, but so far as was then known, and to every outward appearance, his general good health was unimpaired.

The evidence is that the 23d of July, 1940, falling in a period of protracted heat, was an uncomfortable day, the discomfort of it probably arising from its high humidity rather than from any extraordinary heat. Whether the temperature out of doors noticeably heightened the temperature within respondent's foundry is not disclosed, but the accordant testimony is that it was "hot" outside the foundry and still warmer within it. When the question was put to the foreman, "It's a pretty hot place, isn't it?" (referring to the foundry), he answered laconically, "Any foundry is"—a reply, we take it, to be quite unquestioned.

In the foundry stood two furnaces constructed of brick and steel; the larger having a capacity for 8,000 pounds of metal, the smaller 6,500 pounds. Throughout the six-and-a-half-hour period required for the reduction of the scrap aluminum to molten metal, a temperature ranging from 1,200 to 1,300 degrees was maintained in the furnaces.

The furnaces were loaded by opening their doors, each three feet square, and by tossing into them pieces of scrap

aluminum, very irregular in shape, and ranging in weight from five to thirty pounds. In each process, when the metal first tossed in had been partially melted down, the furnace doors were again thrown open and the furnaces refilled by the same method. Four men working the same shift did the work, and on the day in question Kattack had a hand in it.

When the metal became molten, an aperature plugged with fire clay at the bottom of the furnaces was opened up by a man experienced in the task; the molten lead flowed out through a steel channel, lined with fire clay, to a discharging spout, and thence was deposited in iron pans on rollers on a truck conveyor, which conveyor was pushed by the man, through the use of metal rods, into a cooling chamber. In this work, which was said not to be arduous, Kattack shared. The molten metal in the pans cooled into ingots, weighing from twenty-seven to thirty pounds each, which, when sufficiently cooled, were stacked by hand on skids. In this work Kattack also participated.

With the excessive heat of the foundry and the physical toil indispensable in the operation of it, it was a job in which, as the evidence shows, newcomers might be expected to collapse; of this experienced men on the shift were apprehensive; and an eye was kept on Kattack on this account. At about eight o'clock he was observed to be in trouble; he complained of pains in his chest; he was seen to be breathing with difficulty; and he was led upstairs into an open yard. Within five or ten minutes he went back to the foundry, with his hands pressed on his chest, saying he could not get his breath and attributing his observed distress to the abnormal and unaccustomed heat.

The respondent maintained in this department a water cooler for the men, from which they drank at frequent periods, as intended. Kattack drank from it from time to time, and he appears to have vomited as often as he drank. He kept doggedly at his work. At quitting time he made light of the matter to his fellow-workers and walked home. As he approached his home it was evident that he was a stricken man; his head was bowed; his step was slow and faltering. Once home he was in a state of great prostration; his speech

was despairing; his eyes glassy; the surface of his body clammy; his hands clasped to his chest, as if to thrust out pain. In the course of the night, in his home, he vomited from time to time, as in the foundry.

In the afternoon of July 24th the doctor who examined him determined that he was suffering from coronary thrombosis and sent him to the hospital.

The hospital records, admitted in evidence by consent, confirmed the diagnosis of the doctor and recorded the thrombosis as starting at eight P. M., the hour of his chest pains, on the evening of July 23d.

The decedent died in the hospital on July 31st, 1940, from a coronary thrombosis. On this point, at least, all the testimony is in accord. It is undisputed that from the time of his entrance into the hospital in mid-afternoon on July 23d until his death, he remained prostrate and in a critical state of health.

It is now obvious, we take it, that this case cannot be here disposed of, as in the Bureau, with the incautious and sweeping statement that the "proofs in this case are barren of a single scintilla of evidence which tends to establish that Kattack's death was due to an accident, compensable or otherwise, while in the respondent's employ."

At about five o'clock P. M. on July 23d Kattack walked into the foundry with high blood pressure and hardened arteries, to be sure, but in apparent health; in its superheated atmosphere, to which he was not inured, a new man in a four-man shift, who had undergone no muscular exertion, two days excepted, in nearly half a year, he toiled with them at lifting out of metal boxes some seven tons of metal, the fragments weighing from five to thirty pounds apiece. At the end of three hours he was visibly stricken with acute chest pains and with marked difficulty in breathing, his distress reflected in his face, and presently he had recurring fits of vomiting. By 1:45 o'clock July 24th he was indisputably very ill, and so continued until his death a week later, and this by all the evidence. These are capital facts of great weight, not to be lost sight of when considering and comparing the testimony of the medical experts. What is it they say?

The petitioner called Dr. Harry Irving Katz, who was not examined on the central matter of the relation, if any, between Kattack's employment on July 23d and his death on July 31st, Dr. Alvin E. Cortese, Dr. Adolph Kroll and Dr. A. Hobson Davis. The three last named found that the decedent's employment was an initial and contributory cause of his death; and this, if believed, establishes a compensatory accident. *Ciocca* v. *National Sugar Refining Company of New Jersey*, 124 *N. J. L.* 329; 12 *Atl. Rep.* (*2d*) 130.

For the respondent, Dr. Allen Yager, Dr. Usher Yaguda and Dr. George P. Olcutt, Jr., testified.

Dr. Katz, a general practitioner, upon examining Kattack on the afternoon of July 24th, found shortness of breath, the mucous membranes pale, respiration 40 per minute, a pulse rate of 120, temperature 97.3, blood pressure 110 over 88, loud rales throughout the lungs, and heart sounds faint.

Dr. Frank McDede, into whose care Kattack passed on entering the hospital, but who did not testify in the case, agreed with Dr. Katz's diagnosis and found the patient suffering from a coronary thrombosis.

The correctness of this diagnosis was unquestioned by the medical experts in the case. That the man's death on July 31st resulted from a coronary thrombosis was likewise assumed by them all.

There appears a curious divergence of expert opinion as to whether or not on July 23d Kattack suffered an attack of exhaustion.

Dr. Cortese, a practitioner of traumatic medicine, but not a cardiologist, testified that Kattack suffered such an attack, his symptoms on the evening of July 23d being typical of heat exhaustion; that the attack was productive of a shock to his system; and that the shock precipitated a coronary occlusion, eventually causing his death.

Dr. Kroll, agreeing with Dr. Cortese that Kattack's death was an ultimate consequence of his physical toil in the high temperature of the foundry, flatly rejected the theory of heat exhaustion, although saying that many of the clinical symptoms of heat exhaustion are the same as those of coronary thrombosis, and that a man may suffer both at the same time.

He dwelt upon the man's hypertension; "180 over 100" he declared to be a common symptom of high blood pressure; and "110" diastolic a sign not of a sound but a pathological state. In his opinion it was this pathological condition in the decedent which, coupled with his muscular exertion in the excessive heat, produced a coronary occlusion on July 23d, and that the occlusion so enfeebled the heart that on July 31st it failed altogether.

Dr. Davis, a pathologist, found that on July 23d Kattack had a "mild" attack of heat stroke or heat exhaustion (the two terms denoting, he said, different extents or degrees of the same thing; heat stroke being the severe or extreme case, and heat exhaustion the mild one) ; and the heat exhaustion produced subendocardial hemorrhages with definite injury to the endocardium on the left side of the heart, which injury caused a mural thrombus; and the breaking off of a fragment of the thrombus and its passing into and obstructing the coronary artery several days later gave him the second coronary occlusion, from which he died.

In the view of Dr. Davis, Kattack suffered on July 23d both a mild attack of heat exhaustion and a coronary thrombosis and both were produced by his physical work in the excessive heat of the foundry.

Testifying in the interest of the respondent, Dr. Olcutt said that Kattack had not suffered an attack of heat exhaustion or exhibited any symptom of it; and that there was no causal relationship between Kattack's employment in the foundry and his death. He conceded that arteriosclerosis is the most common cause of changes in the coronary arteries leading to coronary thrombosis, and while he held that stress and strain do not effect a coronary thrombosis, he said they may deprive the heart of sufficient blood for its nourishment, and that a typical coronary death may result without any actual stoppage discoverable in the blood vessels. He declared that the most common cause which links exertion with death of a person with a pre-existing coronary condition is a degeneration of the heart muscle from an impoverishment of blood supply, and that at some moment of exertion the heart suddenly stops.

Dr. Yager testified that there was no causal relation between the work on July 23d and Kattack's death. He assigned as the basis of his opinion that there was no unusual effort or extraordinary strain, and found no sign of an attack of heat exhaustion. He granted in the end that unusual effort and extraordinary strain are relative things, and said in effect that a man in one state of health may undergo prodigious exertion without harm, while another in a pathological condition may suffer coronary thrombosis on slight exertion.

Dr. Yaguda found no connection "either through causation or aggravation" between the employment and Kattack's death from a second coronary thrombosis. But he found, as did all the experts, that the decedent had a hardening of the coronary arteries, and with this in mind he declared that the earlier occlusion set up a disturbance in the coronary circulation and that disturbance facilitated the formation of the second occlusion, from which he died. He did, in short, allow a relationship between the first occlusion and the fatal one after all.

The proofs must show that the employment contributed to Kattack's death. Under the cases, absolute demonstration is not required of the petitioner. *Jackson* v. *Delaware, Lackawanna and Western Railroad Co.,* 111 *N. J. L.* 487; 170 *Atl. Rep.* 22; *Hercules Powder Co.* v. *Nieratko,* 113 *N. J. L.* 195; 173 *Atl. Rep.* 606; *affirmed,* 114 *N. J. L.* 254; 176 *Atl. Rep.* 198; *Auten* v. *Johnson,* 115 *N. J. L* 72; 178 *Atl. Rep.* 187. Under the evidence, the whole body of the medical testimony establishes her case with a high degree of probability.

Her petition was erroneously dismissed.